**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Christopher Mansoori,<br><br>    *Plaintiff*,<br><br>v.<br><br>Joseph Brown, et al.,<br><br>    *Defendants*. | No. 17 CV 8846<br><br>Judge Lindsay C. Jenkins |

**MEMORANDUM OPINION AND ORDER**

Christopher Mansoori filed this lawsuit under 42 U.S.C. § 1983 alleging he endured unconstitutional conditions of confinement at Cook County Jail. Defendants Joseph Brown and Andres Garcia have moved for summary judgment, arguing that Mansoori cannot establish that jail conditions were objectively unreasonable in violation of the Due Process Clause of the Fourteenth Amendment. For the reasons explained below, the motion is granted.

**I.    Background**

The court draws on the parties' Local Rule 56.1 statements to recount the facts, which are undisputed except where otherwise noted. [Dkts. 247, 251.] The court views the record in the light most favorable to Mansoori. See *Frazier-Hill v. Chi. Transit Auth.*, 75 F.4th 797, 801 (7th Cir. 2023).

Between July 2016 and early 2018, Mansoori was housed in Division XI at Cook County Jail. [Dkt. 247, ¶ 7.][1] Defendant Joseph Brown was the Jail Superintendent, and Defendant Andres Garcia was a Commander. [*Id.*, ¶ 3–4.] Mansoori maintains that two aspects of his livings conditions violated the constitution: the frequency with which his clothing was laundered (Count One) and moldy showers (Count Two).

**A.    Laundry**

According to Mansoori, laundry for detainees was not washed nearly frequently enough, forcing him to re-wear dirty clothes, especially socks and shirts. More specifically, through a declaration, Mansoori claims that he had four pairs of socks that were rarely washed, requiring that he re-wear dirty ones. [Dkt. 244, ¶ 6.]

---

[1] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

Eventually, his feet turned red and itchy, his toenails darkened and cracked, and the lack of clean socks caused him to contract a foot fungus. [*Id.*]

Mansoori complained of the laundry issue to Commander Garcia in person, who "only ordered laundry washed" after receiving one of Mansoori's grievances. [*Id.*, ¶ 4.] On July 1, 2016, Mansoori filed a grievance that stated, "our whites[…]haven't been washed in almost a month," and the lack of extra changes of clothes was "unsanitary, unhealthy and bad on the mind." [Dkt. 231-7 at 1.] The response section of this grievance, which was signed by Garcia, states that Mansoori's unit had been serviced as of the response date, July 12, 2016. [Dkt. 247, ¶¶ 15-16.] The parties agree that because this grievance was marked as a "non-grievance (request)," no appeal was required. [*Id.*, ¶ 16.]

Mansoori filed a second laundry grievance in November 2017 complaining that his white laundry, including socks, t-shirts, towels and underwear, had not been washed in the last two months. [Dkt. 231-8 at 1.] The grievance explained that the Jail had allowed him to wash his clothes just twice over the four-month period spanning July to November 2017—once in July and again in September. [Dkt. 231-8 at 1.] The grievance noted that washing laundry in the sink was unsanitary but that he was "forced to wash like this" because it was the only way to keep things clean. [*Id.*] Mansoori timely appealed the second laundry grievance.

Mansoori's declaration in opposition to summary judgment states that long periods passed without clothes being laundered. [*Id.*, ¶ 6 ("Our tier had white laundry washed twice in six months"; "In 180 days white laundry was washed twice, leaving me with 172 days of dirty socks, resulting in me contracting foot fungus.")] According to Mansoori, he tried washing clothes in the sink with a bar of soap, but signs posted at the Jail told detainees not to do so. [Dkt. 247, ¶ 9.]. Over time, his feet became red and cracked and itchy. [*Id.*]

Mansoori obtained a tube of anti-fungal cream from another detainee, which he used for about a month before he saw a dermatologist in January 2018. The doctor examined Mansoori's left toenail and foot and noted the "left big toenail with mild distal yellow discoloration, no thickening,"; "doubt onychomycosis of left big toenail, may be trauma induced;" and that the condition was "considered cosmetic." [Dkt. 248 at 3; Dkt. 231-5 at 14.][2] The doctor prescribed miconazole topical cream and

---

[2] Mansoori attempts to dispute certain of these asserted facts by stating that the dermatologist's report "was falsely prepared to diminish the extent of Plaintiff's injuries," or that the report fails to accurately "capture the medical findings made at the time and orally expressed to Plaintiff from the medical provider." [Dkt. 247, ¶¶ 30-33.] He cites only to the medical notes prepared by the doctor, but no contrary evidence. To the extent he has failed to properly dispute the asserted fact, it is deemed admitted. L.R. 56.1(e)(3) ("Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material.");

suggested a follow-up visit in six months. [*Id.*; Dkt. 251, ¶ 2.] Mansoori was released from Cook County Jail in February 2018 before he could be seen for follow-up. [Dkt. 247, ¶¶ 31-34.]

### B. Mold

Mansoori's cell was near the showers, which contained harmful mold, a condition he endured for more than a year and a half. [Dkt. 244, ¶ 4.] According to his declaration, the showers and shower walls were completely covered in black, brown and pink mold. Even after jail staff painted over the mold to conceal it, the paint peeled as the mold continued to grow and "mold spores went into the air and traveled into his cell as he slept." [*Id.*, ¶ 1.] As for his injuries, Mansoori claims that a previously diagnosed heart condition was made worse by exposure to mold and that he "woke up feeling sick every single morning, congested from the mold, and I had to take extra time to clear my sinuses out, before I started my day." [*Id.*, ¶ 3.]

Mansoori filed a grievance about the mold in August 2016 but it is undisputed that he did not appeal it. [Dkt. 231-9; Dkt. 247, ¶ 24.] According to Mansoori, he submitted a second mold grievance in November 2017 but he claims that the grievance form he submitted "was not scanned into the Sheriff's database properly and was not preserved." [Dkt. 251, ¶ 3.] Unaware that his second mold grievance had not been logged, Mansoori "filed what he believed to be an appeal related to moldy shower conditions" on December 4, 2017.

Mansoori also avers that he directly complained of the moldy showers to Garcia and also to Brown on a day when Brown came to Mansoori's tier. [Dkt. 244, ¶ 5.] According to Mansoori, around January 1, 2018, following his discussion with Brown, a corrections officer brought Mansoori a two-foot long scrub brush courtesy of Brown, and told Mansoori to "scrub the mold out of the showers every day," which Mansoori did. [*Id.*] This lawsuit followed in 2017.

## II. Legal Standard

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

---

*Keeton v. Morningstar*, Inc., 667 F.3d 877, 884 (7th Cir. 2012) (where that party has failed to create a genuine dispute, the fact is deemed admitted).

bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

### III. Analysis

#### A. Exhaustion

Defendants argue that they are entitled to summary judgment on Mansoori's conditions of confinement claim premised on mold because he failed to exhaust his administrative remedies. Under the PLRA, prisoners must "exhaust administrative remedies before filing a federal claim about prison conditions." *Crouch v. Brown*, 27 F.4th 1314, 1320 (7th Cir. 2022). Exhaustion, applied at summary judgment, requires a defendant official to "demonstrate that the plaintiff [] failed to exhaust the applicable grievance procedures and that those procedures were available to him as a matter of law." *Jones v. Lamb*, 124 F.4th 463, 467 (7th Cir. 2024). The defendant bears the burden of proving the affirmative defense of a failure to exhaust. *Gooch v. Young*, 24 F.4th 624, 627 (7th Cir. 2022).

To satisfy the PLRA's exhaustion requirement, Mansoori must have filed a grievance that raised the same claim as that which is raised in this lawsuit to ensure that "a prison has received notice of, and an opportunity to correct, a problem before being drawn into litigation." *Jackson v. Esser*, 105 F.4th 948, 958–59 (7th Cir. 2024) (internal quotation omitted). To provide adequate notice, a grievance must describe "the nature of the wrong for which redress is sought." *Id.* at 959 (quoting *Schillinger v. Kiley*, 954 F.3d 990, 995 (7th Cir. 2020)).

Here, Defendants submitted a grievance log regarding various grievances Mansoori filed with jail officials between March 2016 and January 2018. [Dkt. 231-6 (documenting numerous grievances).] The submitted records reveal that in August 2016, Mansoori submitted a grievance complaining of mold in the showers and that a response was sent to him in early September 2016. [Dkt. 231-9 at 2.] There is no dispute that Mansoori did not appeal this denial within fourteen days of receiving a response. [Dkt. 247, ¶¶ 59-64 (rendering undisputed that Mansoori received but did not appeal the denial of the mold grievance)] This grievance, therefore, was not exhausted because Mansoori did not file an appeal "in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002).

Mansoori argues that he submitted another mold-related grievance in November 2017 but that the grievance "was not scanned into the Sheriff's database properly and was not preserved." [Dkt. 251, ¶ 3.] Unaware of this issue, Mansoori explains that he "filed what he believed to be an appeal related to moldy shower conditions" on December 4, 2017. [*Id.*] He did this by taking a separate grievance he filed related to a barbershop complaint and writing the following in the appeal section: "mold is still all over multiple showers and is completely out of control. Staff

4

just replying they go through the motions of cleaning [this] is not acceptable." [Dkt. 248 at 7.]

If a detainee points to "sufficient factual allegations demonstrating a genuine dispute as to whether the administrative remedies were available to him, the district court [is] obligated to conduct a *Pavey* hearing to resolve the factual dispute." *Smallwood v. Williams*, 59 F.4th 306, 318 (7th Cir. 2023) (citing *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008)). "Such factual disputes can arise even when the prison denies that any grievance was filed, and the prisoner provides "no documentation to back up his claim" that he filed a grievance because a "swearing contest requires an evidentiary hearing to resolve." *Jackson*, 105 F.4th at 957.

Ordinarily a hearing would be required on these facts. Because Mansoori claims that he filed a grievance in November 2017 that the Jail did not log and process, and because Defendants deny that this happened, the court could only resolve whether the mold claim was exhausted through a *Pavey* hearing. *Id*. But having analyzed the merits of both the laundry and the mold claim below, neither claim survives summary judgment, so the exhaustion question is moot.

**B.      Merits[3]**

A conditions of confinement claim brought by a pretrial detainee arises under the Fourteenth Amendment and requires the court to apply the objective reasonableness standard set forth in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015); see also *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) ("Pretrial detainees may assert a conditions-of-confinement claim under the Fourteenth Amendment's Due Process Clause."). This standard requires Mansoori to bring forth evidence that: (1) the conditions in question were objectively serious, meaning that they posed a substantial risk of serious harm; (2) the defendants acted purposefully, knowingly, or recklessly with respect to the consequences of their actions; and (3) defendants' actions were "objectively unreasonable—that is, 'not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose.'" *Hardeman*, 933 F.3d at 827 (Sykes, J., concurring) (quoting *Kingsley*, 576 U.S. at 398); see also *Redman v. Downs*, 854 F. App'x 736, 738 (7th Cir. 2021).

Jails are not required to provide a "maximally safe environment" free of pollution or safety hazards. *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001). Rather, to constitute an objectively serious constitutional deprivation, the alleged

---

[3]      For purposes of the motion, the court assumes that Mansoori's declaration is sufficient to show that each Defendant personally "knew of and disregarded an excessive risk to inmate health or safety." *Gray*, 826 F.3d at 1008 (cleaned up). [Dkt. 244, ¶ 4 (Garcia and Mansoori "spoke at least three times about the mold, but most likely closer to five occasions."); ¶ 5 (explaining that in or around November 2017, Brown came to Mansoori's tier and Mansoori raised concerns about the laundry and mold with Brown "a couple of times.")]

condition must deprive a detainee of "the minimal civilized measure of life's necessities." *Hardeman*, 933 F.3d at 820 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Life's minimal necessities include "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities." *Hardeman*, 933 F.3d at 820 (cleaned up).

The court assesses the severity, duration, and extent of harm caused by conditions to determine whether they rise to such a deprivation. *Id.*, at 824; *Thomas v. Illinois*, 697 F.3d 612, 614-15 (7th Cir. 2012). Though he was a pretrial detainee, there is "little practical difference, if any, between the standards applicable to pretrial detainees and convicted inmates when it comes to conditions-of-confinement claims, and . . . such claims brought under the Fourteenth Amendment are appropriately analyzed under the Eighth Amendment test." *Smith*, 803 F.3d at 309; see also *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 554 n.31 (7th Cir. 2016).

### 1. Laundry

Infrequent laundry service alone is not an objectively serious condition that violates the constitution. *Wojtaszek v. Dart*, 555 Fed. Appx. 628, 628–29 (7th Cir. 2014) (no Eighth Amendment violation when inmate alleged "bedding was exchanged only one or two times per month, laundry service was available even less so, and he once went seven weeks without laundry service for his uniform [] he was not allowed to wash himself"); see also *Myers v. Ind. Dep't of Corr.*, 655 Fed. Appx. 500, 503 (7th Cir. 2016) (allegation that laundry items were discolored and smelled "like sweaty gym clothes" did not give rise to constitutional claim, but noting that in some circumstances, inadequate laundering can pose a risk to an inmate's health by exposing him to others' bodily fluids or communicable diseases).

As the court observed at an earlier phase of the case, detainees are "entitled to laundry access over long periods of time." [Dkt. 68 at 13 (citing *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989) (affirming district court's entry of judgment in favor of a prisoner who established that he "was denied laundry service during his first five months" in a particular housing unit).] Equally important, an "adverse condition of confinement, if endured over a significant time, can become [a constitutional] violation even if it would not be impermissible if it were only a short-term problem." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016); *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (reasonable jury could have found that sleeping on a wet and moldy mattress for fifty-nine days amounted to a sufficiently serious condition).

Mansoori's declaration in opposition to summary judgment states that officials allowed him to wash his clothes only twice over a six-month period, leaving him with "172 days of dirty socks, resulting in me contracting foot fungus." [Dkt. 244, ¶ 6.] He states that he "repeatedly spoke with Commander Garcia" about the laundry (and the mold) but that Garcia "only ordered laundry washed after a grievance submission." [*Id.*, ¶¶ 4, 6.] His second laundry grievance from November 2017, while

somewhat inconsistent with the timing described in his declaration, says that officials allowed him to wash his clothes only twice over a four-month period in 2017 (from July to November 2017). [Dkt. 231-8 at 1.] While Mansoori had access to a bar of soap and a sink, it is undisputed that detainees were not permitted to wash clothes in their sinks; a sign posted in Mansoori's tier prohibited detainees from doing so. [Dkt. 231-5 at 19.] Drawing reasonable inferences in his favor, Mansoori has shown that he had only intermittent laundry service for a long period of time.

But to survive summary judgment, he must also show that the offensive condition entailed a substantial risk of serious harm. See *Hardeman*, 933 F.3d at 827 (Sykes, J., concurring). "Actual, present harm is not required; conditions that pose an unreasonable risk of serious damage to the detainee's future health may violate a detainee's Fourteenth Amendment rights." *Mays v. Dart*, 454 F. Supp. 3d 1074 (N.D. Ill. 2020) (cleaned up) (citing *Henderson v. Sheahan*, 196 F.3d 839, 847 (7th Cir. 1999)).

Here, though the failure to provide regular laundry service was certainly unpleasant, Mansoori has not shown how that failure posed an unreasonable risk. His task in responding to a motion for summary judgment was to identify "specific, admissible evidence" showing that there is a genuine dispute of material fact regarding a risk of serious harm, and he has not done so. *United States ex rel. Sibley v. Univ. of Chicago Med. Ctr.*, 44 F.4th 646, 662 (7th Cir. 2022). The most he can do is point to his own experience—itchy feet, darkened toenails and "foot fungus" as a result of wearing dirty socks. But that does not establish a substantial risk of harm sufficient to survive summary judgment.

Cases in which prisoners have claimed they received deficient medical treatment for minor fungal infections are instructive on this point. A medical condition is sufficiently serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). A condition also may be objectively serious if a "failure to treat it could result in further significant injury or the unnecessary and wanton infliction of pain." *Hayes v. Snyder*, 546 F.3d 516, 522–23 (7th Cir. 2008).

In the context of deficient medical care claims, courts in this Circuit have repeatedly held that athlete's foot is not objectively serious. Indeed, itchy feet and foot fungus are the precise types of symptoms that have been found not objectively serious in the medical context, and those cases are instructive here. The court in *Gray v. Ghosh* extensively analyzed the issue and concluded on summary judgment that "as far as this court is aware, every court to have considered the question has held that a foot fungus (that is, athlete's foot) does not satisfy the objective component" of conditions of confinement claim. 2013 WL 5497250, at *1 (N.D. Ill. Oct. 3, 2013) (collecting cases). See also *Perez v. Hardy*, 2015 WL 5081355, at *7 (N.D. Ill. Aug. 27,

7

2015) (collecting cases rejecting the contention that athlete's foot is a objectively serious medical condition); *Hutcherson v. Moore*, 2013 WL 5165740, at *4 (N.D. Ill, Sept. 13, 2013) (collecting cases holding that fungal conditions, such as athlete's foot and jock itch, are neither life-threatening nor serious enough to violate the Eighth Amendment); *Robinson v. Milwaukee Secure Det. Facility*, 2016 WL 3620770, at *2 (E.D. Wis. June 29, 2016) (granting defendants' motion for summary judgment because inmate's itchy bedbug bites that were relieved by hydrocortisone cream were not a serious medical condition). *Roberts v. Dawalibi*, 2017 WL 926772, at *6 (N.D. Ill. Mar. 8, 2017) ("garden-variety athlete's foot—even if it is accompanied by chronic itching, dry and peeling skin, and discomfort—does not rise to the level of a serious medical need").

True, Mansoori saw a dermatologist for his foot fungus while at the Jail and was prescribed an anti-fungal cream. [Dkt. 248 at 3; Dkt. 231-5 at 14.] But as the cases above explain, foot fungus is not particularly serious. The same is true of his red and itchy feet and darkened toenails, which are not sufficiently serious to implicate the Constitution. See, e.g., *Sledge v. Kooi*, 564 F.3d 105, 107 (2d Cir. 2009) (holding that eczema is not an objectively serious); *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997) ("a toe whose toenail had been removed did not constitute a serious medical need, although, no doubt, quite painful."). The undisputed evidence shows that the fungus was treated with a topical medication and did not result in serious injury. *Passmore v. Josephson*, 376 F. Supp. 3d 874, 883 (N.D. Ill. 2019) (dirty underwear plaintiff claimed caused an itchy, painful genital rash that was later treated with a topical corticosteroid was not sufficiently serious to support his conditions of confinement claim); *Jackson v. Dart*, 2025 WL 2147257, at *7 (N.D. Ill. July 29, 2025) (plaintiff had not established serious injury from incidents of smoke exposure, despite seeking medical attention for coughing, chest pains, and symptoms resolved shortly after the exposure because the "exposure to smoke was brief and infrequent and did not result in serious injury.")

On this record, a reasonable fact finder could only conclude that Mansoori experienced a mild and readily treatable condition. He has not identified any other risks to his health posed by infrequent laundry service, so he has not raised a triable issue as to substantial risk of harm. Having failed to do so, the court need not analyze whether the response to the laundry issue was objectively reasonable. Summary judgment is granted as to Count One.

### 2. Mold

Mansoori also maintains that for more than a year-and-a-half, he was exposed to mold and breathed in mold spores that developed in the showers on his tier, which were located close to his cell. [Dkt. 244, ¶¶ 1, 3 ("I endured this condition for over fifteen months. I woke up feeling sick every single morning congested from the mold and I had to take extra time to clear my sinuses out.")] Though not every exposure to a potential environmental hazard amounts to a constitutional violation, prolonged

8

exposure to mold can constitute an objectively serious condition. See *Board v. Farnham*, 394 F.3d 469, 485-486 (7th Cir. 2005) (holding in the Eighth Amendment context that exposing prisoners to "contaminated with black mold contaminated with black mold and fiberglass liner" through the ventilation system "'is contrary to current standards of decency.'")

Defendants maintain that the mold exposure claim cannot survive because Mansoori had an ability to clean: after raising his concerns with Brown directly, he was provided with a scrub brush in January 2018. [Dkt. 247, ¶ 40; Dkt. 244, ¶ 5.] But as Mansoori rightly notes, the brush was provided only after he complained about the mold for more than a year, and about one month before he was released in February 2018. [Dkt. 247, ¶ 45.]

As with his laundry claim, Mansoori has failed to show, "to a reasonable degree of medical certainty," that the mold in the shower posed a substantial risk of serious harm to his health. *Henderson*, 196 F.3d at 851. He contends that the mold put him at increased risk because of his heart condition, but he has failed to show that the mold in the shower posed a risk to his heart.

It is undisputed that Mansoori did not seek or receive treatment for exposure to mold while housed at Cook County Jail. [Dkt. 247, ¶ 50.] Because the link between mold and any injury is not obvious, he must provide a plausible basis for his belief that the two are linked. A plaintiff's own belief about the cause of a medical condition is generally not enough at the summary judgment stage. See *Green v. Walker*, 398 F. Appx. 166, 169 (7th Cir. 2010) ("But even if the ventilation system were inadequate, summary judgment was appropriate because Green presented only conclusory allegations that inadequate ventilation caused disease and respiratory problems."); *Jackson*, 2025 WL 2147257, at *7 ("plaintiff's own beliefs about the cause of his current cough are also insufficient to create a question of fact.")

To make the connection, Mansoori first points to a series of medical records generated between 2019 through 2021 long after his release from Jail in 2018. [Dkt. 248 at 16–21.] The records include medical evaluations for an undisputed congenital heart condition Mansoori has had since birth. [Dkt. 247, ¶ 4; Dkt. 251, ¶ 6.] As Defendants note, however, the post-release medical records make no mention of mold exposure, breathing difficulties or lung problems. Mansoori says the records support his claim that his heart condition "made breathing mold much more injurious and difficult to breathe," but his loose, overly generalized description of the records fails to identify any evidentiary support for his statement. [Dkt. 251, ¶ 6.] Indeed, at least one record, a chest CT angiogram in October 2019, suggests no damage to his lungs of any kind. [Dkt. 248 at 20 (noting clear lungs and an unremarkable airway).] In short, he offers nothing beyond his belief that mold in the air caused his heart condition to worsen.

9

Mansoori also points to his declaration, which generally describes how the exposure to mold caused him to "wake up feeling sick every single morning, congested from the mold," which required "extra time to clear my sinuses out." [Dkt. 244, ¶ 6.] Even assuming that his congestion and sinuses were impacted by mold, these symptoms fall short of an objectively serious injury. *Henderson,* 196 F.3d at 845-846 ("Nor do we believe that a layperson would consider the injuries alleged in Henderson's complaint to be so serious as to require a physician's care and attention. Instead, the injuries of which Henderson complains—breathing problems, chest pains, dizziness, sinus problems, headaches and a loss of energy—are, objectively speaking, relatively minor.") While the court does not doubt that the experiences Mansoori describes caused him some distress and discomfort, his congestion is not "the sort of objectively serious injury or medical need that amounts to a denial of the minimal civilized measure of life's necessities." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).[4] As a result, the court declines to analyze whether Defendants' response to mold was objectively reasonable. Summary judgment is granted as to Count Two.

Finally, combining the conditions Mansoori describes together does not do enough to save his claim. Even viewed collectively, the conditions were not so extreme that they violated constitutional standards.

IV. Conclusion

Defendants' motion for summary judgment motion is granted.

Enter: 17-cv-8846
Date: February 19, 2026

Lindsay C. Jenkins

---

[4] In a last attempt to show injury, Mansoori's declaration states that he "repeatedly attempted to receive mental health treatment for everything he has endured, including the living conditions alleged in this complaint," and his requests were either denied or his treatment was inadequate. [Dkt. 251, ¶ 8.] He supports this statement by citing two grievances he filed in 2021, years after the events at issue in this case. [Dkt. 248 at 21-22.] The sham affidavit rule prevents Mansoori from relying on this portion of his declaration to defeat summary judgment. *See, e.g., Foster v. PNC Bank, Nat'l Ass'n*, 52 F.4th 315, 320 (7th Cir. 2022); *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) (the rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony). During his deposition, Mansoori testified that he never sought mental health treatment for the conditions at issue in this case. [Dkt. 231-5 at 20-21 ("Q.: Have you sought mental healthcare at any point based on this? A.: Specifically, for this, no….;" "Q.: Have you suffered any other injury: physical, psychological, mental, that we have not discussed yet? A.: As a result of the conditions? Q.: Yes, specifically as a result of the conditions in this lawsuit. A.: No."] He may not reverse course now.